Maria Isabel Navarro v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-02-049-CR

     MARIA ISABEL NAVARRO,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 

From the 219th District Court
Collin County, Texas
Trial Court # 219-80975-99
                                                                                                                

MEMORANDUM OPINION
                                                                                                                

      Maria Isabel Navarro appeals her conviction by a jury of the offense of reckless or criminally
negligent injury to a child. The trial court assessed her punishment at two years’ confinement in
the Texas Department of Criminal Justice, State Jail Division. She contends in two points that
there is a variance between the proof and the allegations in the indictment and that the evidence
is legally insufficient to support her conviction. We affirm.
      Appellant contends in point one that there is a variance between the proof and the allegation
in the indictment that she “intentionally, knowingly, recklessly, and with criminal negligence
caused bodily injury to Issac Navarro, a child fourteen (14) years of age or younger by twisting
the arm of the said Issac Navarro.” She contends that the evidence did not show that she injured
Issac by twisting his arm.
      In determining the sufficiency of the evidence based upon a variance between the indictment
and the proof, we utilize a purely state law standard in which we measure evidentiary sufficiency
against the elements of the offense as defined by the hypothetically correct jury charge for the
case. Fuller v. State, 73 S.W.3d 250, 252 (Tex. Crim. App. 2002). A hypothetically correct jury
charge takes into consideration the material variance doctrine, meaning that allegations giving rise
to immaterial variances may be disregarded in the hypothetically correct charge, but allegations
giving rise to material variances must be included. Id. at 253. Consequently, we must make a
materiality inquiry. Id. Only a material variance will render the evidence insufficient. Id.
      A materiality inquiry requires a determination of whether the variance deprived the defendant
of notice of the charges or whether the variance subjects the defendant to the risk of later being
prosecuted for the same offense. Id. There is no indication in the record that appellant did not
know the manner in which she was accused of injuring her child or that she was surprised by the
proof presented at trial. Also, we fail to see how the variance subjects appellant to the risk of later
being prosecuted for the same offense. Consequently, we conclude that any variance between the
indictment and proof is immaterial. See id. at 254. The manner in which one injures a child is
not a statutory element of the offense. Tex. Pen. Code § 22.04(a)(3) (Vernon 2003). 
Consequently, under the state law standard, the evidence is sufficient to support appellant’s
conviction despite any variance. See Fuller, 73 S.W.3d at 254.
      In urging that the State was required to prove an unnecessary particular allegation of how an
assault was committed, appellant relies upon the case of Burrell v. State, 526 S.W.2d 799, 802
(Tex. Crim. App. 1975). Her reliance is misplaced because Burrell is part of a line of cases that
was overruled in Gollihar v. State, 46 S.W.3d 243, 256 (Tex. Crim. App. 2001). We overrule
point one.
      Appellant contends in point two that the evidence is legally insufficient to support her
conviction. In reviewing the legal sufficiency of the evidence to support a conviction, we view
all the evidence in the light most favorable to the verdict. Cardenas v. State, 30 S.W.3d 384, 389-90 (Tex. Crim. App. 2000); Narvaiz v. State, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992). The
critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. McDuff v. State, 939
S.W.2d 607, 614 (Tex. Crim. App. 1997). This standard gives full play to the responsibility of
the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.
2781, 2789 (1979). The standard for review is the same for direct and circumstantial evidence
cases. Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).
      Dr. James Touchey testified that he is an emergency physician working at the Medical Center
of Plano. He indicated his belief that appellant and her husband Jose brought their child, Issac,
into the emergency room of the Medical Center on January 2, 1999. He identified x-rays showing
a break in Issac’s upper left arm, in the humerus bone. Dr. Touchey related that the information
given to him and the nurse at the triage area was that Issac was in a car seat and was pushed off
a couch by his brother.
      Dr. Touchey acknowledged that appellant’s explanation for the injury is or could be consistent
with the injury suffered by Issac. He stated that he could not recall anyone giving an explanation
that someone had grabbed Issac by the hand in attempting to stop the fall. Dr. Touchey testified
that it is possible that the injury could have occurred as it did if someone had grabbed the arm. 
He insisted that the force of the fall could have caused the break if the child’s arm was outside the
confines of the car seat and the car seat fell over. He indicated that typically there would not have
been such a break if the arm had been grabbed and twisted because that would have caused a
“spiral break,” as opposed to the “transverse break” actually suffered by Issac. Dr. Touchey also
stated that due to the pliability of an infant’s bones, it would take an extremely large amount of
force for the arm to be broken if some pressure was applied to the outside. Dr. Touchey
acknowledged that he observed no other injuries to the child at the time of his examination.
      Dr. Touchey testified that he referred the matter to Child Protective Services because he
thought appellant might need to learn increased parenting skills in order to prevent such an injury
in the future. He said if other injuries had been found in Issac the night he examined him it would
have “sent off bells and whistles” because in that event he would be more concerned about child
abuse, as compared to child neglect. He related that statistical instances of such an injury being
child abuse go way up in the event of multiple injuries. He said he would be highly suspicious
of abuse if a hypothetical child had a fracture such as Issac’s and also had older bucket-handle
fractures in the hips and older fractures along the knee. On cross-examination, Dr. Touchey noted
that there were three possible alternatives to the injury happening other than by abuse: by falling
to the floor, as originally stated by the father; if appellant had grabbed the child in mid-air before
he fell; and if the arm was external to the baby carrier and the edge of the carrier was against the
outside of the humerus bone. After indicating that it was also possible that shaking the child could
have caused such a fracture, Dr. Touchey acknowledged that he is not an expert in child abuse.
      Tina Hamilton, who at the time of Issac’s injury was an emergency room nurse at Medical
Center, testified that Jose Navarro, appellant’s husband and Issac’s father, had reported that Issac
had fallen off the couch onto the car seat. She said Dr. Touchey indicated that it was a spiral
fracture. She indicated that the procedure at Medical Center was to call Child Protective Services
in the event of a spiral fracture because of the high probability of child abuse. She related that Dr.
Touchey seemed to be in agreement with that decision. She insisted that a spiral fracture could
not have occurred in the manner described by Jose.
      Carlos Castaneda testified that he is a patrolman with the Plano Police Department. He said
that late on January 2, 1999, or early on January 3, he went to appellant’s residence to interview
her. He said she told him that the previous afternoon she had been sitting on a couch with Issac
in his baby carrier on one side of her and another son on the other side. According to Castaneda,
appellant related that when she got up to transfer some clothes from her washer to the dryer, she
heard a thump, then heard Issac crying. He said that she told him that when she turned, Issac was
face down on the floor with the carrier on top of him. He said her husband Jose affirmed that he
was interpreting what she was saying correctly, as appellant was speaking in Spanish. Castaneda’s
interpretation is consistent with appellant’s written statement that appears in the record.
      Officer Castaneda testified that a child welfare worker present at the scene wished to confront
appellant about how the break could not have occurred that way. He said that when he asked
appellant about it she said that Issac might have fallen on a toy. He related that when Child
Protective Service took Issac into custody, appellant did not try to say goodbye to the baby or kiss
it, but that her husband Jose was very emotional. He indicated Jose was crying and worried about
the baby being cold.
      Jay Dominguez testified that he is a police officer with the Plano Police Department. He said
that when he interviewed appellant, she told him that she got up to get clothes out of the dryer
when she noticed that the baby carrier had toppled over and Issac had fallen on his face. He
related that she said she had tried to catch the baby from falling off the sofa, but did not say she
grabbed the baby’s arm. He indicated that after he told her it could not have happened by the
child just hitting the ground, she stated that she had grabbed the baby by the arm before it toppled
over, but that he slipped out of her arm and fell on his face on the floor.
      Kathy Stamm testified that she is an investigator in the family violence unit of the Plano Police
Department. She indicated that she saw Issac at Children’s Medical Center in Dallas after he was
taken there. She said he had a small bruise under his right eye, a small bruise on his forehead,
and a red mark on the side of his face. She also said he had some small red marks on his
shoulders that she learned were broken blood vessels. She indicated that he also had a fractured
leg. Stamm related that, from her training, multiple fractures in an infant usually indicate
intentional, not accidental, child abuse. Stamm testified that the couch was about three and a half
feet from the washer/dryer area. Stamm identified an object that appellant told her she used as
protection to keep Issac from falling. Stamm indicated that the use of protectors to protect
children from falling is consistent with good care. 
      Michelle Hiza testified that she is with the Texas Department of Protective and Regulatory
Services or Child Protective Services. She said she received a referral at 10:50 p.m. on January
2, 1999 and notified the Plano Police Department. She said that she talked with someone at the
hospital named Deborah who looked in Issac’s medical chart and confirmed that he had a spiral
fracture. Hiza confirmed that appellant told her, as translated by Officer Castaneda, that she had
gotten up from the couch to change the washer and dryer when she heard a thump and, upon
turning, saw Issac face down on the ground in his car seat. She said that after she told appellant
it was a twist fracture and asked her if anything else happened, she said he must have fallen on a
toy. 
      Hiza testified that in a subsequent interview appellant told her that she had seen the baby
carrier going over, had tried to grab it, bumped it and grabbed Issac’s arm, but he still fell. She
said that appellant told her that Issac may have broken his leg by being in the “bouncy seat.” She
indicated that appellant said Issac’s hand was inside the carrier when he fell.
      Hiza testified that when she saw Issac at Children’s Medical Center he had bruising on both
sides of his cheeks, a bruise on his forehead, and red splotches on his arms. She said the leg
fractures were old injuries, but she did not know how old.
      Dr. Thomas Abramo testified that he is a pediatrician practicing at Children’s Medical Center
in Dallas. He indicated that Issac, in addition to his arm fracture, had a hip fracture and what
appeared to be fractures on both knees. He noted that the fracture of the humerus was a
“transverse” fracture, meaning that the arm was bent back. As to whether it was a “spiral”
fracture, Dr. Abramo stated, “[I]t has some tendencies for it, but isn’t exactly a hundred percent
a spiral fracture. A spiral fracture would be more of a torque type of injury. But this more of
what we call a ‘fulcrum,’ a bending back.” Dr. Abramo stated that the status of the hip fracture
indicated that the fracture was, at a minimum, seven to fourteen days old. He testified that one
of the leg fractures was less than seven days old, while another fracture was older, perhaps as
much as four weeks.
      Dr. Abramo testified that the arm fracture being caused by Issac falling to the floor from the
couch while in a car seat is not consistent with what he has seen in his practice, and that the other
fractures, from what he has seen in his practice, are not consistent with being in a “bouncy.” He
stated it would be more indicative of child abuse. He said his final diagnosis is physical abuse
beyond an acceptable range. Speaking of the non-arm fractures, Dr. Abramo said, “You know,
just yanking to the side really quickly wouldn’t do it. It has to – usually has to have enough force
that the child is being brought against – stationary in one object and being forced against the
other.” Speaking of the fact that Issac had been in Children’s Medical Center in December for
RSV, a child’s respiratory infection, he said there was no treatment program for RSV that would
cause those types of injuries in Issac’s legs. 
      On cross-examination, Dr. Abramo gave the range of the age of the hip fracture as between
seven to fourteen days minimum to a maximum of three to four weeks. He said he could not recall
whether, when he said the injury was inconsistent with the history, he had the information about
the possibility that appellant grabbed Issac’s arm. He insisted, however, that the type of arm
fracture was not consistent with the grab of the arm out of the infant seat. He said it was unlikely
to have happened that way, with there being a less than one percent chance.
      Dr. James Stagner testified that he is a pediatric ophthalmologist. He indicated that he
examined Issac in March 1999 and diagnosed him with a cataract of the right eye and a condition
called esotropia, where the eye drifts out of line. He said Issac also had vitreous bleeding inside
the eye. He stated that he could not tell how old any of those conditions were. His opinion was
that the condition was caused by traumatic injury, such as a shaking injury, or being dropped. 
      Marcia Hookie testified that she is a foster parent for the Texas Department of Protective and
Regulatory Services. She said that after Issac was placed in her care, she noticed he had a red rash
and bruises everywhere and that there was something wrong with his legs. She indicated that “the
worker” suggested she take Issac to Children’s Medical Center in Dallas, which she did. 
      Jose Navarro testified that Issac was born prematurely and had to stay in the hospital for
twenty-three days. He testified concerning Issac’s hospitalization at Children’s Medical Center
in December preceding the incident in question. He said that at the time in question appellant was
caring for the children while he worked full time, including some overtime. He indicated that
since he worked in construction, there were some days he would stay home and help. He
acknowledged that only he and appellant were caring for Issac at this time and that he did not do
anything to hurt Issac. He said that he had not told officers that appellant had tried to grab Issac
by the arm because he did not remember. He said he believed that she had told him that. 
      In arguing that the evidence is insufficient, appellant contends that the social worker and
police who were originally involved in the case erroneously believed that Issac’s arm fracture was
a spiral, rather than a traverse fracture; that Dr. Touchey did not believe that the traverse fracture
amounted to child abuse; and that Dr. Abramo did not have a good recall of the history
surrounding the injury to Issac’s arm. Regardless of the type of fracture suffered by Issac, Dr.
Touchey, while acknowledging that Issac’s injuries could have been caused in some way other than
abuse, testified that if he had noticed Issac’s other injuries at the time of his treatment, he would
have been more concerned about child abuse than child neglect because statistical instances of such
an injury being child abuse go way up in the event of multiple injuries.
      Also, Dr. Abramo testified that his diagnosis of Issac was physical abuse beyond an
acceptable range. He indicated that Issac’s arm fracture having been caused by falling off a couch
while in his baby carrier was not consistent with what he had seen in his practice, even if appellant
grabbed Issac’s arm. Appellant seems to suggest that the jury could not rely on Dr. Abramo’s
testimony because he was relying on the social worker’s notes for the history, although she does
not suggest any way in which the history was inaccurate. We hold that the evidence is legally
sufficient to support appellant’s conviction. We overrule point two.
      The judgment is affirmed.

                                                                   JOHN G. HILL
                                                                   Senior Justice

Before Chief Justice Davis,
      Justice Vance, and
      Senior Justice Hill (Sitting by Assignment)
Affirmed
Opinion delivered and filed June 11, 2003
Do not publish
[CR25]